IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK A. CAMPBELL,
also known as NICOLE ROSE CAMPBELL,
and STEVEN MILLER,

                    Plaintiffs,

        v.                                                OPINION and ORDER

SERGEANT BRUCE, ROBERT KRUEGER,                          17-cv-775-jdp
JASON ALDANA, STEVEN JOHNSON,
ROBIN DIEBOLD, PAUL KEMPER, CATHY JESS,
and CINDY O'DONNELL,

                    Defendants.

Pro se plaintiffs Nicole Rose Campbell (whose legal name is Mark) and Steven Miller are transgender women incarcerated at Racine Correctional Institution (RCI), a men's correctional facility. Campbell and Miller allege that defendants—eight Department of Corrections officials—have refused to provide them with adequately private shower facilities, which they say subjects them to a substantial risk of sexual assault and harassment by inmates and prison staff. Both sides have moved for summary judgment. Dkt. 29 and Dkt. 42.

Campbell and Miller say that defendants violate the Eighth Amendment by failing to ensure that they can shower out of view of guards and male inmates, and that they violate the Equal Protection Clause of the Fourteenth Amendment by failing to afford them the same degree of privacy that other inmates enjoy. But the evidence shows that RCI offered plaintiffs the opportunity to shower at a different time from general population inmates, and that except for two requests made to defendant Robert Krueger (an RCI unit manager), Campbell and Miller have not asked for separate shower times. Instead, plaintiffs ask for shower doors tall enough to shield their heads from view, but that would pose a risk to inmate safety and security.

So I will deny plaintiffs' motion for summary judgment, grant defendants' motion, and dismiss the case.[1]

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

Campbell and Miller are transgender women, meaning they were born with male genitals but they identify as women. Both have been taking hormones for years and have developed female breasts. As transgender prisoners, Campbell and Miller face challenges and risks that their cisgender counterparts don't. Transgender prisoners face heightened risk of sexual assault—a fact defendants don't dispute for purposes of summary judgment. Dkt. 53, ¶ 94. Campbell and Miller do not allege that they have suffered sexual assault or bias-motivated violence, but they contend that they face an increased risk of sexual assault and harassment because of RCI's shower facilities.

Campbell and Miller both arrived at RCI, a medium-security correctional facility located in Sturtevant, Wisconsin, in September 2016. Two of RCI's several housing units are relevant to this case: the Milwaukee Unit and the Kenosha West Unit. Campbell spent several weeks in the Milwaukee Unit before she was transferred to the Kenosha West Unit in November 2016. Miller was housed in the Kenosha West Unit before being transferred to the Milwaukee Unit in February 2017. Campbell and Miller contend that the shower facilities in both units are insufficiently private and thus put them at risk of harassment and assault. Defendants contend that each unit's shower facilities afford adequate privacy.

---

[1] The dismissal of this case moots plaintiffs' recently filed motion to compel discovery, Dkt. 70, so that motion is denied.

## A. RCI's shower facilities

Plaintiffs' primary complaint about RCI's showers is that the front shower stall doors do not afford full coverage of their bodies. A showering inmate's head remains visible over the door's opaque privacy shield, which plaintiffs say allows "any male inmate [to] easily see over the shower stall doors . . . and see the breasts of the transgender women while they are showering." Dkt. 53, ¶ 55.

The best way to get a sense of plaintiffs' concerns is through photographs of the showers in question.

### 1. Kenosha West Unit showers

The Kenosha West shower facilities consist of partitioned stalls separated by opaque floor-to-ceiling panels. The shower doors are made of chain-link fencing. Each door is fitted with an opaque Plexiglas shield positioned to cover the showering inmate's midsection. Before February 2018, the Kenosha showers looked like this:





Dkt. 45-2, at 2, 3.

In February 2018, the Kenosha showers were modified to provide more coverage. After modification they look like this:





Dkt. 45-6, at 5, 1.

### 2. Milwaukee Unit showers

RCI's Milwaukee Unit also has partitioned shower stalls, separated by opaque white panels that are approximately six feet high. Plaintiffs agree that these side partitions are tall enough that showering inmates can't peer into adjacent stalls. Dkt. 57, ¶ 8 ("Plaintiffs do not dispute that the individual shower stalls are divided so inmates cannot see one another from the next stall over."). But the shower doors are shorter, so the head and feet of a showering inmate remain visible to onlookers. The following photograph shows the Milwaukee Unit showers:





Dkt. 45-1, at 2, 5.[2]

Plaintiffs contend that in both units the top of the shower doors are still too low. But defendants say that staff need to be able to see an inmate's head and feet while in the shower to maintain the safety and security of the institution, so the doors cannot safely be made any higher. Dkt. 57, ¶ 19.

## B. RCI's policies regarding shower privacy for transgender inmates

To enforce the Prison Rape Elimination Act (PREA), the United States Department of Justice has issued regulations instructing that prisons should afford transgender and intersex inmates "the opportunity to shower separately from other inmates." 28 C.F.R. § 115.42(f). The Wisconsin Department of Corrections' Division of Adult Institutions (DAI) has adopted policies consistent with these regulations. Specifically, DAI Policy 500.70.27 provides that "[i]nmates taking cross-gender hormones or with secondary sex characteristics of the desired gender (e.g., biological males with breast development) shall be showered separately from other inmates." Dkt. 34-44, at 7 (DAI Policy 500.70.27(VII)(D)). RCI also has a policy of requiring any male staff member to announce his presence before entering the shower area when transgender women prisoners are showering. Dkt. 57, ¶ 27.

Sometime in 2016, defendant Jason Aldana (RCI's security director for much of the period at issue in this litigation) met with RCI's transgender inmates to discuss ways to facilitate more private showers. Dkt. 57, ¶ 30. (Defendants don't say when in 2016 this meeting occurred or whether Campbell and Miller were present at it.) Aldana first offered to

---

[2] RCI modified the Milwaukee Unit showers in February 2017. Photographs of the Milwaukee Unit showers before the update are not in the record. For purposes of this decision, I will accept plaintiffs' contention that the height of the stall doors did not change in the 2017 modification. Dkt. 57, ¶ 9.

move all the transgender inmates to the Green Unit, which had shower curtains. But the inmates refused because the Green Unit is an intake unit and is thus more restrictive than other housing units. Aldana then proposed designating a separate shower time specifically for transgender inmates. But the inmates rejected that option because they wanted to be able to shower on their own schedules.

According to defendant Paul Kemper, the RCI warden, Aldana's offer remains open: transgender inmates may shower at a separate time from male inmates if they want to. *Id.* ¶ 24. He says that other inmates "are not allowed to loiter on the tiers while inmates are in the shower, so it is unlikely that a male inmate could view a transgender inmate in the shower." *Id.* ¶ 25. Campbell and Miller dispute these facts. They assert that "Campbell has requested a few times for a separate shower time from male inmates and was denied by Krueger and Aldana." *Id.* ¶ 24. Furthermore, they contend that that male inmates could circumvent the ban on loitering by "walking very slowly on the tier," and that inmates "do loiter anyway" despite not being allowed to do so while inmates are in the shower. *Id.* ¶ 25.

## C. Plaintiffs' shower-related correspondence

Campbell and Miller began submitting shower-related requests and inmate complaints shortly after arriving at RCI. I summarize these submissions and what prompted them below.

### 1. Campbell's correspondence

When Campbell first arrived to RCI in September 2016, she wrote to the Health Service Unit to request that she be allowed to shower out of view of male staff and inmates. Health Service Unit staff put a note in Campbell's "Special Handling Summary" saying that she "should be allowed to shower alone and out of the sight of the general population." Dkt. 34-20, at 2–3.

On October 12, 2016, Campbell sent a note (called an "interview request") to Aldana complaining about the showers on the Milwaukee Unit. She wrote:

> [O]n Milwaukee Unit the showers may have stalls and you may consider them private, but they are not private at all. The shower stalls all are low[,] the men can easily look over the stalls, can see into the shower stalls from the stairs. . . . I just simply asked to shower during count as was done many times before and you denied me that which puts me in extreme danger.

Dkt. 54-1, at 2–3. Aldana wrote a response on the bottom of the interview request: "The shower issue will be looked at, but inmates don't shower during count." *Id.* at 2.

On October 17, Campbell wrote another interview to Aldana request reiterating her concerns about the height of the shower doors on the Milwaukee Unit. She asserted that the "most simpl[e] solution" would be to move her to the Kenosha Unit. Dkt. 34-14, at 2. Aldana responded that RCI was "working on a shower solution," but that Campbell would "not move to Kenosha." *Id.* But, for reasons the parties don't explain, Campbell was moved to the Kenosha West Unit a short time later, on November 2.

This transfer did not alleviate Campbell's shower-related concerns, and she continued lodging complaints about the shower situation over the next year.[3] She filed this federal lawsuit with plaintiff Miller in October 2017. On January 10, 2018, Warden Kemper sent Campbell a memorandum stating as follows:

> You[r] concerns regarding the west side shower stalls on the Kenosha unit and the amount of coverage they provide have been brought to my attention. As was done to the showers on the east

---

[3] At one point, Campbell used a blanket to cover the shower door and obscure her from view, which led to a conduct report that Campbell challenged through numerous complaints and appeals. The conduct report was ultimately reversed in a state-court certiorari action. *See* Dkt. 54-3 (certiorari decision by Judge Juan B. Colas, dated December 10, 2018).

side of the unit, we will be incorporating some additional coverage to these stalls.

The changes will include a solid surface on each door which will cover the individual[']s midsection approximately from the shoulders down to the shin area of the leg. I anticipate this change will be completed within the next 60 days.

During the time in which the showers remain in the current form, you are being afforded the opportunity to move to the east side of the Kenosha unit or one of two alternative units, the Milwaukee or Green housing units. Each of these units have shower stalls which provide additional coverage you seek.

Dkt. 34-10, at 2.

Campbell did not take Kemper up on his offer to transfer units. In a February 6, 2018 letter to Kemper, Campbell explained that the "East side of Kenosha Unit and all of Milwaukee Unit shower stall doors are worse than the West side of Kenosha," and that the Green Unit was similarly unacceptable because the shower doors there were covered by a vertical strip of blue cloth that left gaps on either side. Dkt. 34-11, at 2–3. Campbell further explained that the planned modifications to the Kenosha West shower stalls that Kemper had described would not be satisfactory because the front stall doors would still only extend up to an inmate's shoulders, meaning that "[i]nmates and staff standing on the staircase landing, on the upper tier across from the shower stalls or in the shower area before the shower stalls would still be able to see over the improved shower stall doors." *Id.* at 1. Campbell ended the letter by offering to drop this lawsuit and a related state-court action on three conditions: (1) that RCI raise the height of the shower doors in the Milwaukee and Kenosha Units to match that of the between-stall dividers (approximately 6 feet high); (2) that RCI reimburse Campbell and Miller for their litigation-related filing, copy, and postage fees; and (3) that Campbell's conduct report for

using a blanket in the showers be completely expunged from her prison record. *Id.* at 2. It is not clear whether or how Kemper responded to this offer.

Additional frontal coverage was added to the Kenosha West Unit shower stalls on February 26, 2018 (as pictured above). But the shower doors leave the heads of the showering inmates visible and Campbell continues to believe that the lack of privacy exposes her to a risk of assault and harassment.

### 2. Miller's complaints

Most of Campbell's shower-related complaints concerned the shower facilities in the Kenosha West unit, but the focus of Miller's complaints was the shower stalls in the Milwaukee Unit. Like Campbell, Miller has a note in her Special Handling Summary that she "is to shower alone." Dkt. 34-32, at 2. In February 2017, shortly after arriving at the Milwaukee Unit, Miller spoke to Krueger in person and Aldana through a written interview request about her dissatisfaction with the showers. She wrote:

> On Feb. 7, per the unit manager Mr. Kr[ue]ger, I was moved from Kenosha West to Milwaukee West. When I notified Mr. Kr[ue]ger that the showers on Milwaukee are not partitioned in the front for [gender dysphoria] inmates he directed me to you. Now I am writing to be moved back to Kenosha West. I am also giving you notice that an outside PREA Complaint has been filed.

Dkt. 34-30, at 2. Aldana responded with a single sentence: "The showers in Milwaukee are being converted to look like Kenosha." *Id.* Miller was not transferred back to Kenosha West. The showers in the Milwaukee Unit were modified later that month, but Miller says that the short front shower doors were not raised.

Miller raised additional concerns about the shower facilities over subsequent months by filing a PREA complaint, Dkt. 34-40; several interview requests, Dkt. 34-26–34-29; and four

ICRS complaints, Dkt. 34-25; Dkt. 34-33; Dkt. 34-34; Dkt. 34-35. Her complaints were rejected, and nothing was done to modify the Milwaukee Unit shower stall doors.

## D. 2019 PREA audit

Under PREA regulations, the United States Department of Justice audits prisons for compliance with PREA standards every three years. *See* 28 C.F.R. § 401. Among other things, PREA auditors check that prisons provide transgender and intersex inmates the opportunity to shower separately from other inmates. RCI was audited in July of 2016, before this lawsuit, and then again in March of 2019, while the parties' cross-motions for summary judgment were pending.[4]

In 2016, the PREA auditor determined that RCI was "in full compliance" with PREA standards and identified no problems with RCI's shower facilities. Dkt. 47-4, at 4. But in 2019, the PREA auditor indicated that RCI was not in compliance with PREA standards, in part because "in the Milwaukee and Kenosha Units, showers were not sufficient to meet the standards for transgender inmates showering alone." Dkt. 69-3, at 6. Specifically, the auditor noted that the sides of the shower stalls in the Milwaukee and Kenosha units had "gaps through which transgender inmates' genitals could be viewed." *Id.* at 13. In the days following the on-site audit, RCI staff modified the Kenosha Unit showers by extending the opaque barriers that divide the shower stalls to eliminate the possibility that a showering inmate might be able to peek into the neighboring stall. Defendants have submitted photographs depicting that modification from various angles:

---

[4] I requested supplemental briefing about the 2019 PREA audit, Dkt. 61, and have considered the parties' responses. *See* Dkt. 73, at 2–3 (explaining which materials I considered).





Dkt. 69-3, at 1–3. In a subsequent report, the auditor noted that following the on-site audit, RCI staff had sent "pictures of improvements made in the Kenosha showers," but that "verification for Milwaukee showers [was] still pending." Dkt. 69-3, at 13.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

In my screening order, Dkt. 12, I granted Campbell and Miller leave to proceed on: (1) Eighth Amendment failure-to-protect claims based on their allegations that defendants endanger their safety by refusing to permit them to shower in private; and (2) Fourteenth Amendment equal protection claims based on their allegations that defendants discriminate

against them because of their transgender status by allowing male inmates to shower in a private manner while refusing to provide transgender women the same opportunity.

## A. Summary judgment standard

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment against that party is appropriate. *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (quoting *Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990)). "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

## B. Eighth Amendment failure-to-protect claims

To prevail on their Eighth Amendment claims, plaintiffs must show that (1) the conditions of their incarceration posed a substantial risk of serious harm; (2) each defendant

was subjectively aware of that risk; and (3) each defendant consciously disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 838–40 (1994). The parties dispute each of the three elements, and both sides contend that the undisputed facts entitle them to summary judgment on the Eighth Amendment claims.

Plaintiffs assert two failure-to-protect claims: (1) defendants have not afforded them an opportunity to shower outside the presence of general population inmates; and (2) the physical layout of the showers does not afford adequate privacy, even if plaintiffs are permitted to shower at a separate time away from the general population inmates. For reasons explained below, defendants are entitled to summary judgment on both claims.

### 1. Opportunity to shower outside the presence of general population inmates

Defendants contend that RCI gives transgender inmates the opportunity to shower at a separate time from male inmates if they wish. Dkt. 57, ¶ 24. But Campbell and Miller dispute that this is RCI's policy. They contend that "Campbell has requested a few times for a separate shower time from male inmates and was denied by Krueger and Aldana." *Id.* (Plaintiffs say nothing about Miller, although it turns out Miller made one such request as well. *See* Dkt. 34-29, at 2.) Nothing in the record suggests that RCI's stated separate-shower-time policy is a sham, or that plaintiffs couldn't take advantage of it if they wanted to.

Of the many interview requests and ICRS complaints that plaintiffs filed, only three ask about a separate shower time:

1. Campbell's October 12, 2016 interview request to Aldana, in which she asked that she be allowed to shower during count. *See* Dkt. 54-1, at 3.

2. An undated interview request from Campbell to Krueger asking "to be showered separately" or for "a special shower time." *See* Dkt. 54-2, at 2.

3. A June 18, 2017 interview request from Miller to Krueger asking him to "please set up a time with your staff" when she could be "showered alone." *See* Dkt. 34-29.

The rest of plaintiffs' correspondence with defendants relate to their desired modifications to the physical layout of the showers and Campbell's shower-related conduct report. These three requests about separate shower times are not enough for plaintiffs to survive summary judgment.

### a. Campbell's interview request to Aldana

Campbell's October 12, 2016 interview request to Aldana shows only that Aldana refused to allow Campbell to shower separately at her preferred time—during count. *See* Dkt. 54-1, at 3 ("I just simply asked to shower during count as was done many times before and you denied me that which puts me in extreme danger."). Aldana told Campbell that "inmates don't shower during count." *Id.* at 2. Aldana's refusal does not suggest that Aldana wouldn't have permitted Campbell to shower separately at some other time were she to ask. Campbell provides evidence that other institutions allow transgender inmates to shower during count, *see* Dkt. 35-1 and Dkt. 35-2 (declarations from transgender inmates who say that they were allowed to shower during count at Oshkosh Correctional Institution and Kettle Moraine Correctional Institution). But that evidence isn't relevant to the question whether Aldana would have allowed Campbell to shower separately at another time that would not complicate the inmate count process.

Just as the Eighth Amendment does not entitle a prisoner seeking medical treatment to "demand specific care" or "the best care possible," *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), neither does it entitle Campbell to demand the specific, optimal shower time of her choice. RCI was required only to take "reasonable measures to meet a substantial risk of serious

harm." *Id.* Aldana's refusal to permit Campbell to shower at the time of her choice does not show that Aldana was unwilling to take reasonable measures to address Campbell's shower-privacy concerns. His refusal to allow Campbell to shower during count does not violate the Eighth Amendment.

### b. Plaintiffs' interview requests to Krueger

Plaintiffs submitted two interview requests to Krueger asking that he arrange a separate time for them to shower. Campbell's request reads:

> Mr. Krueger, I need to know in writing if you are going to accommodate my Medical Restriction/Special Needs from HSU or not and DAI Policy 500.70.27, which states under VIII Accommodations D., "Inmates taking cross-gender (e.g., biological males with breast development) <u>shall be</u> showered separately from other inmates." I request to be showered separately from the other inmates or a special shower time per my medical restriction/special needs and DAI 500.70.27.

Dkt. 54-2, at 2 (emphasis in original).[5]

Miller submitted a similar request to Krueger on June 18, 2017, in which she wrote: "I am a transgender[e]d inmate and have a medical restriction to be showered separately from other inmates. I need you to please set up a time with your staff when I can be showered alone, per HSU, DAI, PREA and ACLU directives. Thank you." Dkt. 34-29, at 2.

These inquiries request separate shower times. But the bottom halves of both interview request forms, where prison officials typically respond to inmate inquiries, are blank. Defendants say that there is "no evidence [that Campbell's interview request] was ever received

---

[5] The request is labeled "copy for file for court," so I assume it is a duplicate of the version Campbell submitted. It is undated, but in the accompanying declaration, Campbell says that the interview request is "dated 4/24/2016." Dkt. 54, ¶ 6. The date can't be right because Campbell didn't arrive at RCI until September 2016, so I will assume that Campbell meant to say that the request is from April 24, 2017.

by Krueger." Dkt. 57, ¶¶ 19, 24, 38. (They don't mention Miller's request, but presumably someone at RCI received it because defendants produced it with a Bates stamp.)

Drawing inferences in plaintiffs' favor, I assume for purposes of summary judgment that Krueger received the requests and did not respond to them. But Krueger is still entitled to summary judgment on plaintiffs' Eighth Amendment claims.

Plaintiffs' damages claims fail because Krueger is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818)). The doctrine is applied with a two-part test: (1) whether the public official violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Here, even if plaintiffs have a right to shower at a separate time from general population inmates, it is not a clearly established one.

A right is "clearly established" when a reasonable official would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (citations omitted). Campbell and Miller bear the burden of demonstrating that their rights were clearly established at the time of the alleged constitutional violation. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). They cannot do so. They cite no case law addressing the Eighth Amendment's application to prison shower practices for transgender inmates. Nor have I found any such cases. "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent." *Campbell v. Kallas*, No. 18-2075, 2019 WL 3886912, at *7 (7th Cir. Aug. 19, 2019) (quoting

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). Because that is not the case here, Krueger is entitled to summary judgment on plaintiffs' damages claims.

Plaintiffs' claims for injunctive relief fail because the record shows that they did not follow up on their requests for separate shower times, focusing instead on their requests for modifications to the shower facilities. They didn't send Krueger a second request for a separate shower time, appeal to other RCI officials, or file ICRS complaints. "When a prison inmate seeks injunctive relief, a court need not ignore the inmate's failure to take advantage of adequate prison procedures, and an inmate who needlessly bypasses such procedures may be compelled to pursue them." *Farmer*, 511 U.S. at 847. And under the PLRA, any grant of injunctive relief in the prison context must be: (1) narrowly drawn; (2) extend no further than necessary to correct the violation of the federal right; and (3) be the least intrusive means necessary to correct the violation of the federal right. 18 U.S.C. § 3626(a)(1).

Here, the record suggests that had Campbell and Miller made clear to additional prison officials their desire to shower at a separate time, their requests would have been granted. Indeed, Aldana made clear his willingness to set up separate shower times for transgender inmates in 2016. By submitting a single request to a single prison official and never following up again, plaintiffs didn't give defendants much of an opportunity to address their concerns. Under these circumstances, summary judgment on plaintiffs' injunctive claim against Krueger is appropriate. *See Ajala v. West*, No. 13-cv-554-bbc, 2014 WL6607428, at *4–5 (W.D. Wis. Nov. 19, 2014); *see also Kramer v. Wis. Dep't of Corr.*, No. 10-cv-224-slc, 2010 WL 11520184, at *4 (W.D. Wis. June 21, 2010) ("[A] district court is not required to entertain a claim for injunctive relief before a prisoner has sought relief from those he wishes to enjoin.").

### 2. Problems with the physical layout of the shower facilities

RCI's standing offer of separate shower times to transgender inmates undermines the other component of their failure-to-protect claims—the problems with the physical layout of the shower facilities. If plaintiffs found the physical layout of the showers insufficiently private, the simplest solution would have been to take advantage of RCI's standing offer of separate shower times. Plaintiffs focused instead on urging RCI to make physical modifications to the shower facilities. Campbell explained that she wished to shower during count because she wanted a time "when the Unit Dayrooms were shut down where there was no movement of the general population of inmates." Dkt. 51, at 8. I infer from this that she believed that showering at some other time would not prevent her from being seen by male inmates milling around near the shower block. But she provides no evidence to support this concern. There is no indication that RCI officials couldn't simply bar general population inmates from the shower area and surrounding tiers during plaintiffs' shower times, thereby alleviating any inmate-movement issues.

But even if I assume that Campbell and Miller hadn't been offered separate shower times, I would still conclude that defendants are entitled to summary judgment on the failure-to-protect claims based on the complaints about the shower facilities. RCI made privacy-enhancing modifications to the shower facilities in February 2017, February 2018, and again recently in response to the 2019 PREA audit, which shows that defendants did not ignore plaintiffs' concerns. Nevertheless, plaintiffs contend that those privacy-enhancing modifications are not adequate. They identify two problems with the physical layout of the RCI showers: the gaps in the side partitions through which inmates could peer into neighboring

shower stalls and, mainly, the height of the shower doors. But neither of these features violates the Eighth Amendment.

### a. Gaps in the side partitions

Plaintiffs contend that the showers in the Kenosha West unit have areas where the "partitions do not go all the way from the wall to the door," leaving gaps "approximately 4"–5" in width" through which "inmates can look into the adjacent shower stall." Dkt. 57, ¶ 21. I infer that plaintiffs are referring to the gaps in the shower partitions noted by the PREA auditor and modified by the addition of extra paneling in 2019. Defendants say that these gaps were only ¼ inch wide, and that they were closed completely after the PREA audit. Dkt. 62, at 1.

Plaintiffs' Eighth Amendment claims about the partitions fail because plaintiffs provide no evidence that any defendant besides Krueger was aware of the problem prior to the 2019 PREA audit. Of all the interview requests and complaints that plaintiffs filed, only one mentions any problem with the side partitions: Campbell's undated interview request that was addressed to but never answered by Krueger. *See* Dkt. 54-2, at 2, 3 (complaining that other inmates "standing in the next shower . . . can see into my shower from the sides" because "the shower stalls are not completely blocked on the sides from the other shower stalls"). Even assuming this interview request put Krueger on notice of the problem, Campbell's claim against him would fail because Krueger is entitled to qualified immunity and because the post-audit modifications to the Kenosha West showers have mooted any claim for injunctive relief.

### b. Height of the stall doors

The dominant refrain in Campbell and Miller's briefs to this court and complaints to RCI officials during the period at issue in this case is that the shower stall doors are too short. At present, shower doors in in the Milwaukee and Kenosha West units cover an inmate of

average height from shoulder to shin, leaving the inmate's head visible to observers looking at the showers straight-on.[6] According to plaintiffs, "if the staff can see the head of the inmates then the staff and male inmates in the shower area can easily look over the shower stall door . . . and see the transgender inmates who have female breast development." Dkt. 51, at 11. The solution, plaintiffs say, is to raise the height of the shower stall doors to "the height of the dividers that separate the shower stalls"—approximately six feet high. Dkt. 34-11, at 3.

Defendants contend that this proposal isn't feasible, because RCI staff need to keep showering inmates' heads and feet in view for safety and security reasons. Campbell and Miller counter that the short shower doors in fact create a threat to the safety and security of transgender inmates because officers and inmates could look over the top of the doors. Defendants don't propose any findings of fact about the specific threat that taller shower doors would pose, but their concerns for safety and security in the shower area are plainly justified. As other courts have recognized, prison officials must be able to monitor inmates to protect them from suicide, assault, and other threats to their Eighth Amendment rights. *See, e.g.*, *Martin v. Gatez*, No. 11-cv-1048, 2012 WL 384526 (S.D. Ill. Feb. 6, 2012) (analyzing Eighth Amendment claim against prison official for allegedly failing to protect an inmate from being assaulted in the shower); *Dunn v. Rice*, No. 04-2280, 2007 WL 9735050 (C.D. Ill. Jan. 22, 2007) (analyzing Eighth Amendment claims against prison officials for allegedly failing to adequately supervise an inmate who committed suicide in the shower); *cf. Simpson v. Joseph*, 248

---

[6] Prior to the 2018 updates, the shower doors in the Kenosha West unit afforded considerably less frontal coverage, as seen in the photograph above. But plaintiffs say that the 2018 modifications didn't allay their concerns. *See* Dkt. 34-11, at 2. Plaintiffs do not address the pre-modification showers in their briefing, so I will deem any complaint about the pre-modification showers to have been forfeited.

F. App'x 746 (7th Cir. 2007) (prison regulation requiring posting of guards during medical examinations of inmates in segregation was reasonably related to legitimate penological concerns and did not violate prisoner's constitutional rights). Plaintiffs' desire for shower doors that completely obscure them from view does not outweigh the prison's countervailing interest in ensuring that inmates are safe and secure while showering.

As transgender prisoners, Campbell and Miller face heightened risks of harassment and assault, and I understand their desire for privacy while showering. But on this record, no reasonable jury could conclude that defendants consciously disregarded a substantial risk of serious harm to Campbell or Miller. The evidence shows that RCI offered to provide them with separate shower times and made efforts to enhance shower privacy while still allowing for necessary levels of supervision. The Eighth Amendment does not entitle plaintiffs to full-body coverage while showering. So I will grant summary judgment to defendants on plaintiffs' Eighth Amendment claims.

## C. Fourteenth Amendment equal protection claims

Plaintiffs also contend that defendants have violated their right to equal protection under the Fourteenth Amendment because defendants allow male inmates to shower in a private manner, but they do not allow transgender female inmates to shower in a private manner. They ask me to treat them as belonging to a protected class and to apply intermediate scrutiny to their claims. But plaintiffs' claims fail on a threshold issue, so I need not determine what level of scrutiny applies.

To establish a claim of discrimination under the equal protection clause, plaintiffs must show that (1) they are members of a protected class; (2) they are otherwise similarly situated to members of the unprotected class; and (3) that they were intentionally treated differently

from members of the unprotected class. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (citing *McNabola v. Chi. Transit. Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). Here, plaintiffs fail to meet the the the third element, because they don't identify any ways in which defendants intentionally treated them differently than cisgender male inmates.

I understand plaintiffs to be pursuing three theories of discrimination. First, they contend that RCI's shower facilities conceal from view the genitalia of cisgender male inmates but not the breasts of transgender female inmates. This is not a conventional discrimination claim, because plaintiffs are challenging the constitutional adequacy of shower facilities that afford roughly the same degree of body coverage to all prisoners, regardless of gender identity. Because plaintiffs have female breasts, they feel exposed in the showers in a way that their cisgender counterparts probably don't. But to prevail on an equal-protection claim under this theory, plaintiffs would need to adduce evidence that defendants decided on the height of the shower stall doors "not for a neutral . . . reason but for the purpose of discriminating on account" of plaintiffs' gender identity. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In other words, plaintiffs must demonstrate that defendants acted with an improper motive, and not simply that their actions had a discriminatory impact. *See Washington v. Davis*, 426 U.S. 229, 239, 245 (1976) (holding that disparate impact alone cannot form the basis of an equal protection claim under § 1983). Plaintiffs have provided no evidence that defendants or anyone else at RCI designed the shower facilities with the intention of putting transgender women prisoners at risk or causing them humiliation or distress. Without any such evidence, plaintiffs cannot show that defendants violated the Equal Protection Clause on this theory.

Second, many of Campbell's interview requests and ICRS complaints allege that she was singled out for discriminatory treatment when she received a conduct report for using a

blanket to cover the shower door. *See, e.g.*, Dkt. 34-5, at 2 (in an interview request disputing the conduct report, Campbell stated: "I have discovered that no one, BUT ME, has EVER been targeted, written up, or even had something said to them about not covering up these shower doors/showers—EVER!!!"). But once again, Campbell provides no evidence that any of the defendants' actions were motivated by Campbell's status as a transgender woman. She doesn't explain whether male inmates used blankets to conceal their bodies from view and got away with it, or otherwise indicate how she knows that she was treated differently on the basis of her gender identity. Again, without such evidence, Campbell cannot show that defendants violated the Equal Protection Clause on this theory.

Third, plaintiffs contend that transgender inmates at RCI are treated differently than transgender inmates at other Wisconsin correctional institutions, which allow transgender and intersex inmates "access to private showers in all circumstances." Dkt. 30, at 24. By this, I understand plaintiffs to mean that transgender inmates at other institutions are permitted to shower during count, whereas transgender inmates at RCI are not (per Aldana's response to Campbell's October 12, 2016 interview request, Dkt. 54-1, at 2). But Campbell and Miller provide no evidence that any of the defendants in this case are responsible for the divergent shower policies within the Wisconsin prison system, so those claims fail as well.

For those reasons, I conclude that defendants are entitled to summary judgment on plaintiffs' equal protection claims.

ORDER

IT IS ORDERED that:

1. Plaintiffs Nicole Rose Campbell and Steven Miller's motion for summary judgment, Dkt. 29, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 42, is GRANTED.

3. Plaintiffs' motion to compel, Dkt. 70, is DENIED as moot.

4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered September 30, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge